PERMANENT PANEL

In the Matter of the Arbitration

between

Howard University and Hospital
of Washington, D.C.

and

Metropolitan Campus Police Officers Union

Class Action Grievance
Contract Violation - Compensation

Case No: 16 300 L 00879 04

OPINION AND AWARD: Dr. Andree Y. McKissick, ARBITRATOR

APPEARANCES:

| | |
|---|---|
| For Management: | Repunzelle R. Johnson, Esquire<br>Associate General Counsel, Labor Relations<br>Howard University, Office of the General Counsel<br>2400 - 6th Street, N.W., Suite 321<br>Washington, DC 20059 |
| For Union: | William G. Jepsen, Jr., Esquire<br>Attorney at Law<br>1711 Stratton Road<br>Crofton, Maryland 21114 |
| DATE AND PLACE OF HEARING: | July 26, 2005<br>Howard University, Office of the General Counsel<br>2400 - 6th Street, N.W.<br>Building A, Suite 321<br>Washington, DC 20059 |
| POST-HEARING BRIEFS: | September 9, 2005 |
| AWARD: | This grievance is sustained. The parties entered into a valid, binding contract on December 23, 2003, as Appendix C was attached and could have been reviewed at that juncture. Based upon evidence presented, the exceptions to this rule of contract law are not applicable. For the reasons stated herein, the remedy of back pay, commencing on the date of the grievance, May 6, 2004, is appropriate. Accordingly, this Arbitrator will retain jurisdiction until Appendix C has been fully implemented. |
| DATE OF AWARD: | November 13, 2005 |

ARBITRATOR

## BACKGROUND

This is the arbitration proceeding pursuant to the grievance and arbitration provisions of the Collective Bargaining Agreement between Howard University and Hospital of Washington, D.C. (hereinafter "Employer") and the Metropolitan Campus Police Officers Union (MCPOU, hereinafter "Union"). The hearing was held on July 26, 2005, at the Howard University Office of the General Counsel, located at 2400 - 6th Street, N.W., Building A, Suite 321, in Washington, D.C. At the hearing, exhibits were offered and made part of the record and oral argument was heard. Post-Hearing Briefs were received on or about September 9, 2005.

## STATEMENT OF THE FACTS

This is a group grievance between Howard University and the Metropolitan Campus Police Officers Union (MCPOU) regarding Article 33, Appendix C, which is a wage provision encompassing pay bands. MCPOU is an independent union that is the exclusive representative of a unit composed of officers and sergeants on the Howard University Campus Police Department, as well as employees in certain security-related positions. The record reflects that negotiations began in June 2003.

The agreement of wages was that each employee, reflecting one's position, would receive either a $4,000 or $6,000 increase to their base salaries. The record also reflects that the parties agreed that each employee could receive an across the board annual increase of 2% (two percent) in year one, 2% (two percent) in year two, and 2% (two percent) in year three. In addition, the parties agreed that such increases would be retroactive to March 27, 2002, which was the expiration of the former contract.

2

Evidence indicates that there was a push to get retroactive checks to Union members due to the Christmas season. The Union held two (2) meetings of its members regarding the Contract. The first was an informational meeting, dated November 13, 2003. Ratification occurred on December 5, 2003, which was the second meeting. Subsequently, the Agreement was forwarded to President Swygert who signed it on December 23, 2003.

The record reveals that Union President McCormick was not provided a copy of the executed Agreement by the end of January. Therefore, she duplicated the "working copy" of the document that Deputy Chief Armstrong had posted for his commanders and supervisors.

Although the Union members received increases to their base salaries in January 2004, discussions regarding Appendix C, reflecting the years in service differential, were continuing. In the ensuing weeks, Attorney Jenkins, Special Association General Council, allegedly informed Union President McCormick that the pay bands in Appendix C had not been agreed to and she should speak to Attorney Kline, the Union's Chief Negotiator. Although the University sought to have Attorney Kline testify, it was objected to by the Union citing attorney-client privilege. This objection was sustained due to reasons noted based upon confidentiality.

Based upon the above events, this grievance was filed on May 6, 2004 alleging violation of Article 33, Section 33.1.4 and Appendix C of the Agreement. Thereupon, the Employer provided a Step II response to Union President McCormick's inquiry regarding the pay bands stating that the years of the pay proposal should not have been incorporated into Appendix C. Step III, dated May 11, 2004, of the grievance process occurred resulting in denial of the grievance. Pursuant to Article 30, Section 30.3.4, Arbitration of the Agreement, this Arbitrator was selected and arbitration ensued.

## STIPULATED ISSUE

Whether or not the Parties had a meeting of the minds on Appendix C, the Wage Compensation package?

## PERTINENT PROVISIONS

The central controversy of this grievance lies within the applicability of the contractual provisions in the aforementioned Agreement between Employer and Union (CBA - Joint Exhibit I), effective March 28, 2002 through March 27, 2005.

## COLLECTIVE BARGAINING AGREEMENT
(Joint Exhibit I)

### ARTICLE 30. GRIEVANCE ARBITRATION PROCEDURE

30.1. Purpose.
30.1.1. The purpose of this grievance procedure is to establish effective machinery for the fair, expeditious, and orderly adjustment of grievances. Only an allegation that there has been a violation, misapplication, or misinterpretation of the terms of this Agreement shall constitute a grievance under the provisions of this grievance procedure.
30.2. Presence of Union Representative.
30.2.1. No pre-disciplinary conference, reprimand, less than satisfactory work performance claim, suspension, discharge, transfer, termination or any other disciplinary action shall be taken against an employee without the prior presence of a Union representative, shop steward, or someone of the employee's choosing to serve as a witness during the initial phase of supervisory disciplinary action. Union representation shall continue throughout the grievance process.
30.3. Grievance Procedure – Steps.
30.3.1. Step 1. Immediate Supervisor:
30.3.1.1. The aggrieved employee and the Union representative, if requested, shall discuss the grievance with the employee's immediate supervisor within ten (10) days of the grievance or the employee's knowledge of its occurrence.
30.3.1.2. The decision of the immediate supervisor shall not be considered binding precedent. The Supervisor shall render a decision within ten (10) days following the hearing date.
30.3.2. Step 2. Chief of Campus Police:
30.3.2.1 If the grievance is not resolved at Step 1, it shall be presented in writing to the Chief of Campus Police within five (5) days following the aforementioned meeting.
30.3.2.2. The Chief of Campus Police (or designee) shall meet with the aggrieved employee and the Union President (or designee), and provide a written answer to the grievance within ten (10) days following receipt of the Step 2 appeal.
30.3.3. Step 3. Director of Business and Fiscal Affairs.
30.3.3.1. The Union may appeal in writing within five (5) days of the receipt of the Step 2 reply to the Director of Business and Fiscal Affairs or designee.
30.3.3.2. The Director of Business and Fiscal Affairs (or designee) shall meet with the Union representative and the grievant and render a written decision within twenty one (21) days following the receipt of the Step 3 appeal. The designee cannot be any individual from the Step 2 level.

30.3.4.   Step 4. Arbitration.
30.3.4.1.   If the Step 3 response is not satisfactory to the Union, it may appeal the grievance to arbitration within seven (7) days of receipt of the Step 3 reply by notification to the Director of Employee and Labor Relations, and the American Arbitration Association for naming an Arbitrator.
30.3.4.2.   The selection of the arbitrator and the conduct of the arbitration hearing shall be in accordance with the rules of the American Arbitration Association. The arbitrator's decision shall be final and binding upon the parties.

## ARTICLE 33. WAGES.

30.2.   Pay Increases.
33.1.1.   Effective March 28, 2002, the minimum and maximum annual rates of pay of each Parking Attendant and Security Officer, Special Police Officer and Senior Special Police Officer, and any vacant position in those classifications, shall be increased per the attached Appendix C. Effective March 28, 2002, each Employee in the above-mentioned four (4) classifications shall receive an increase of 2%. Those Employees receiving a 2% increase shall have their minimum and maximum annual rates of pay increased by 2%.
33.1.2.   Effective March 28, 2003, Employees shall receive an increase of 2%, which shall be added to their existing rate of pay. Effective March 28, 2003, the minimum and maximum annual rates of pay for each position shall also be increased by 2%.
33.1.3.   Effective March 28, 2004, employees shall receive an increase of 2%, which shall be added to their existing rate of pay. Effective March 28, 2004, the minimum and maximum annual rates of pay for each position shall also be increased by 2%.
33.1.4.   A schedule of the minimum and maximum annual rates of pay for each position is attached as Appendix C. No employee's base pay shall be neither less than the minimum nor more than the maximum for the position
33.1.5.   Effective July 1, 2003 and each July 1 thereafter, all employees who have at least six months of active employment in their position as of June 30 and who receives a rating of satisfactory or above on their performance evaluation shall be eligible for a performance pay increase as set forth below. Employees who have less than six months' active employment in their position as of June 30 shall not be eligible for a performance pay increase until the following July.
33.1.5..1.   Pay increases based on performance shall be:

| Rating | Increase |
|---|---|
| Excellent | 3% |
| Above Average | 2% |
| Satisfactory | 1% |

33.1.5.2.   If the calculated increase would cause the employee's pay to exceed the maximum for his/her position, the employer's base pay shall be increased to the maximum for the position and 100% of the difference shall be paid in a single, lump sum payment.

## APPENDIX C

|  |  |  |  |  |  |  | PA, SO | 24.35% |  |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  | SPO | 28.60% |  |
|  |  |  |  |  |  |  | SSPO | 23.60% |  |
|  |  |  |  |  |  |  | MIN/MAX DIFF | 4.50% | 4.50% |
|  |  | 2001 |  |  |  |  |  |  | 20 |
|  |  | P.A. | S.O. | S.P.O. | S.S.P.O. |  |  | P.A. | S.O. |
| Starting | min | $18,263 | $18,263 | $23,004 | $28,339 |  |  | $22,710 | $22,710 |
|  | max | $25,279 | $25,279 | $31,844 | $39,227 |  |  | $23,731 | $23,731 |
|  |  |  |  |  | STEP DIF |  |  | 4.50% | 4.50% |
| After 1 year | min |  |  |  |  |  |  | $23,732 | $23,732 |
|  | max |  |  |  |  |  |  | $24,799 | $24,799 |

|          |     |   |   |   |   | STEP DIF |   | 4.50%    | 4.50%    |
|----------|-----|---|---|---|---|----------|---|----------|----------|
| 5 years  | min |   |   |   |   |          |   | $24,800  | $24,800  |
|          | max |   |   |   |   |          |   | $25,915  | $25,915  |
|          |     |   |   |   |   | STEP DIF |   | 4.50%    | 4.50%    |
| 10 years | min |   |   |   |   |          |   | $25,916  | $25,916  |
|          | max |   |   |   |   |          |   | $27,081  | $27,081  |
|          |     |   |   |   |   | STEP DIF |   | 5.00%    | 5.00%    |
| 15 years | min |   |   |   |   |          |   | $27,212  | $27,212  |
|          | max |   |   |   |   |          |   | $28,435  | $28,435  |
|          |     |   |   |   |   | STEP DIF |   | 5.05%    | 5.05%    |
| 20 years | min |   |   |   |   |          |   | $28,586  | $28,586  |
|          | max |   |   |   |   |          |   | $29,871  | $29,871  |

|         |         |   |         |         | 2.00%   |         |   | 2.00%   |
|---------|---------|---|---------|---------|---------|---------|---|---------|
|         |         |   |         |         | 2.00%   |         |   | 2.00%   |
|         |         |   |         |         | 2.00%   |         |   | 2.00%   |
| 4.50%   | 4.25%   |   |         |         | 4.50%   | 4.50%   | 4.25% | 4.50% |
| 02      |         |   |         |         | 2003    |         |   |         |
| S.P.O.  | S.S.P.O.|   | P.A.    | S.O.    | S.P.O.  | S.S.P.O.|   | P.A.    |
| $29,583 | $35,027 |   | $23,164 | $23,164 | $30,175 | $35,728 |   | $23,628 |
| $30,913 | $36,515 |   | $24,206 | $24,206 | $31,532 | $37,334 |   | $24,690 |
| 4.50%   | 4.25%   |   | 4.50%   | 4.50%   | 4.50%   | 4.25%   |   | 4.50%   |
| $30,914 | $36,516 |   | $24,207 | $24,207 | $31,533 | $37,246 |   | $24,691 |
| $32,305 | $38,067 |   | $25,295 | $25,295 | $32,951 | $38,828 |   | $25,801 |
| 4.50%   | 4.25%   |   | 4.50%   | 4.50%   | 4.50%   | 4.25%   |   | 4.50%   |
| $32,306 | $38,068 |   | $25,296 | $25,296 | $32,952 | $38,829 |   | $25,802 |
| $33,758 | $39,684 |   | $26,433 | $26,433 | $34,433 | $40,478 |   | $26,962 |
| 4.50%   | 4.25%   |   | 4.50%   | 4.50%   | 4.50%   | 4.25%   |   | 4.50%   |
| $33,759 | $39,685 |   | $26,434 | $26,434 | $34,434 | $40,479 |   | $26,963 |
| $35,277 | $41,371 |   | $27,623 | $27,623 | $35,983 | $42,199 |   | $28,175 |
| 4.50%   | 4.50%   |   | 5.00%   | 5.00%   | 4.50%   | 4.50%   |   | 5.00%   |
| $35,278 | $41,471 |   | $27,756 | $27,756 | $35,984 | $42,301 |   | $28,311 |
| $36,865 | $43,233 |   | $29,004 | $29,004 | $37,602 | $44,097 |   | $29,584 |
| 4.70%   | 4.60%   |   | 5.05%   | 5.05%   | 4.70%   | 4.60%   |   | 5.05%   |
| $36,937 | $43,379 |   | $29,158 | $29,158 | $37,675 | $44,247 |   | $29,741 |
| $38,598 | $45,222 |   | $30,469 | $30,469 | $39,370 | $46,126 |   | $31,078 |

| 4.50%   | 4.50%   | 4.25%   |
|---------|---------|---------|
| 2004    |         |         |
| S.O.    | S.P.O.  | S.S.P.O.|
| $23,628 | $30,778 | $36,442 |
| $24,690 | $32,162 | $38,081 |
| 4.50%   | 4.50%   | 4.25%   |
| $24,691 | $32,163 | $37,991 |
| $25,801 | $33,610 | $39,604 |
| 4.50%   | 4.50%   | 4.25%   |
| $25,802 | $33,611 | $39,605 |
| $26,962 | $35,122 | $41,288 |
| 4.50%   | 4.50%   | 4.25%   |
| $26,963 | $35,123 | $41,289 |
| $28,175 | $36,703 | $43,043 |
| 5.00%   | 4.50%   | 4.50%   |
| $28,311 | $36,704 | $43,147 |
| $29,584 | $38,354 | $44,979 |
| 5.05%   | 4.70%   | 4.60%   |
| $29,741 | $38,429 | $45,131 |
| $31,078 | $40,157 | $47,049 |

## POSITIONS OF THE PARTIES

It is the Employer's position that the University never agreed to the pay band, as set forth in Appendix C. Thus, these bands are unenforceable as there was no meeting of the minds on this issue. Moreover, the Employer argues that the Union knew full well that it did not intend to be bound by the pay bands. Besides, the Employer points out, the Union has the burden of proving that the pay bands were agreed to since it seeks to enforce this contract. However, the Employer asserts that the Union has failed to prove the terms of the contract. That is, the Employer contends, the Union did not present any documentation to support the contention that the pay bands in Appendix C were agreed upon at the ratification meeting.

Although the Employer initially rejected the offer of the pay bands, it later stated that it would consider the offer, provided the bands would fit within the $1.8 million authorized limit. At best, the Employer contends, the provision constitutes a counter-offer, not an agreement. Stated differently, the Employer maintains that the proviso is a significant material term that operates as a counter-offer, not a binding contract as the Union asserts.

Additionally, the Employer maintains that the parties continued to discuss the pay bands well after the Contract was ratified on December 23, 2003. Based on all of the above, the Employer concludes that there was no meeting of the minds, thus the pay bands are unenforceable.

It is the position of the Union that the University has refused to honor the contract which constitutes a breach. The Union contends that the parties agreed to the wage scale set forth in Appendix C of the contract after a lengthy session in the Undergraduate Library. The Union asserts that thereafter they ratified the Agreement. Pursuant to the Union's bylaws, the Union argues that there were two (2) informational and ratification meetings at which the provisions

7

were explained to the membership. The Union maintains that the tally of the ratification vote was eighty-eight (88) in favor and none opposed. Although the University asserts that the parties agreed to hold off on Appendix C, the Union counters that no specific documentation was presented as verification of any agreement to that effect. In response to the Employer's assertion of an e-mail from Attorney Kline to Attorney Jenkins indicating that the parties needed to finish negotiations on Appendix C, the Union argues that the Employer admits that it had implemented salary increases in order to give Union members additional pay for Christmas. However, the Union maintains that this e-mail does not controvert the force and effect of President Swygert's action in executing the Contract.

## FINDINGS AND DISCUSSION

After a careful review of the record in its entirety, and after having had an opportunity to weigh and evaluate the testimony of the witnesses, this Arbitrator finds that this grievance shall be sustained for the following reasons.

First, the objective law of contracts is that the written language embodies the terms of the agreement and will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered the contract.

Applying this contractual principle to the current grievance, this Agreement including Appendix C, the pay bands, was submitted to the University's President for its acceptance on December 22, 2003 (Joint Exhibit I). The Agreement was signed and dated by Metropolitan Campus Police Officers Union President McCormick on December 22, 2003 and then by President Swygert on December 23, 2003. Upon President Swygert's signature, the Agreement

became a viable contract, absent duress, fraud or mutual mistake, the exceptions to this general contractual principle.

Second, although fraud, duress and/or mutual mistake was alleged, this Arbitrator finds that there is no evidence to support these allegations. Specifically, the underpinning of fraud is that there is a deliberate intent to defraud or deceive. The record seems to indicate that the Union genuinely thought that the pay bands were negotiated and agreed upon. An informational and ratification meeting was held with that understanding on November 13, 2003 and December 5, 2003, respectively. (U-3, U-4).

Clearly, no one forced anyone's signature. Thus, duress was not a viable exception. Nor was there a mutual mistake by both parties. That is, the Union fully acknowleges that the Agreement was completely agreed upon, which contained Appendix C. (Joint Exhibit I) Instead, it would seem that a unilateral mistake was made when President Swygert failed to carefully review this Agreement, which included Appendix C, before he ratified it. It is interesting to note that the so-called "working copy" of the Agreement was not discovered before it landed upon President Swygert's desk.

Third, the record does not reveal any clear and concrete evidence to support the University's contentions that it was agreed to by the parties and that Appendix C would be tabled for discussion at a later date. That is, the e-mail, dated February 9, 2004, from Attorney Kline to Attorney Jenkins inquiring whether or not he had "any comments/suggestions regarding the salary bands" alone is ambiguous. (M-1) Moreover, this inquiry could relate to its upcoming implementation of the salary scale. The subject matter of the e-mail (M-1), entitled "finishing contract", implies that details after ratification were needed. The preceding sentence also refers

to a request for "Performance Appraisal that is to be used for the guards", which would again appear to suggest implementation of a ratified contract.

Fourth, the absence of President Swygert's testimony is significant because it made it difficult to ascertain his state of mind when he signed the Agreement. The omission to explain his absence is also worthy of note. Thus, without knowing his intent and state of mind, this Arbitrator must conclude that he knowingly and willingly entered a valid and binding Agreement when he signed the contract, which contained Appendix C, Joint Exhibit I.

Fifth, based upon all of the above, the Union has met its burden of proof with supporting data and testimony to show the viability of the Agreement.

Sixth, even the University admits that the prevailing law personifying the objective law of contract is still viable, as are its exceptions, as discussed earlier. The University rightly points to the supportive case law on that issue, DSP Venture Group, Inc. v. Richard M. Allen, 830 A2nd. 850, 2003 DC App. Lexis 535 (2003), which distinguishes unilateral and mutual mistake. It held that "[t]he seller bore the risk of that mistake, as he did not read the contract."

Seventh, looking at the totality of events, it would seem that the University fully agreed to the entire contract, except it had second thoughts on Appendix C because the total cost exceeded the $1.8 million dollar allotment. Besides, it was almost on the eve of Christmas, when the University, in good faith, earnestly sought for the implementation to materialize before Christmas day. Thus, in its haste, the University did not carefully review the entirety of the contract before it was signed by its President. Since the economic duress was not a viable option to collaterally attack the validity of the contract after its ratification, as W.R. Grace and Co. v. Rubber Workers, Local Union 759, 461 US 757 (1983), Footnote 12, points out, the University sought to re-open negotiations only on Appendix C via this arbitration. (Joint Exhibit II)

Eighth, based on the evidence of record, taking into consideration the omission of the testimony of the University's President, this Arbitrator is compelled to conclude that the Agreement was properly executed and ratified upon his signing of the Contract on December 23, 2003.

### AWARD

This grievance is sustained. The parties entered into a valid, binding contract on December 23, 2003, as Appendix C was attached and could have been reviewed at that juncture. Based upon evidence presented, the exceptions to this rule of contract law are not applicable. For the reasons stated herein, the remedy of back pay, commencing on the date of the grievance, May 6, 2004, is appropriate. Accordingly, this Arbitrator will retain jurisdiction until Appendix C has been fully implemented.

_____
ARBITRATOR

C:\HUH v CP-10-05.doc